Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for costs allegedly incurred by it as a result of an alleged breach of a contract between it and defendant, under which plaintiff undertook to manufacture for defendant twelve floating cranes, as well as to supply maintenance tools, spare parts, final drawings, and instruction book therefor.
The chief controversy is over whether defendant was obligated to accept delivery of the parts for the cranes as they were manufactured, and before one crane had been assembled and had satisfactorily passed the test provided for. Defendant refused to do so. Plaintiff says defendant was required to do so, and that its breach of this obligation required plaintiff to store the parts at a cost of $190,521.49. This is the main item of its claim. The other items will be stated later.
There is no specific provision of the contract that deals with the subject of the controversy. To resolve the dispute *307 it is necessary to consider those contract provisions which are at all pertinent, the purpose for which the cranes were purchased and the place of delivery, and the construction placed upon the contract by the parties to it.
As appears from the correspondence and negotiations between the parties, the cranes were contracted for by the United States for the purpose of shipping them to France for use by the French Government under the Lend-Lease Act. The parts for the cranes were to be manufactured by plaintiff and delivered to defendant for shipment to France, and there assembled by the French Government. This fact should be borne in mind in construing section 1-01 of the General Clauses of the contract, and its other provisions. Section 1-01 reads:
Scope of the Contract. The Contract shall include design and construction of 12 floating revolving cranes of 6 metric ton capacity, as well as the supply of maintenance tools, of spare parts and of final drawings.
One crane out of 12 cranes of 6 metric ton capacity shall be erected, complete with barges, and tested in accordance with procedure described in Section 3-07. After satisfactory completion of the tests the cranes and barges shall be again disassembled and prepared for shipping.
A crane is composed of many parts. These were to be so designed and manufactured by plaintiff as to produce a crane that would satisfactorily do the work desired. Any defective, inadequate, or unsuitable part might prevent the crane from operating satisfactorily. It seems unreasonable to suppose, therefore, that defendant was obligated to accept any part for shipment to France until it knew that the sum of all the parts would produce the thing it wanted, which was a complete crane which would do satisfactorily certain specified work. Having been assured of this, defendant was then ready to accept delivery of the parts for shipment to France, but not before then. It would have been foolish to have shipped parts to France until it had been determined that they were the right parts to make up a crane that would operate satisfactorily.
Take for instance the luffing mechanism and the engine to operate it: plaintiff’s design for them was an mmsual *308 design which had not been proven by actual operation to be acceptable. It would have been worse than foolish for the defendant to have shipped them to France until after they had been assembled with other parts into a complete crane and the whole had operated satisfactorily.
There was no provision in the contract requiring defendant to accept the parts before it was ready to ship them to France. Article 10 of the contract, dealing with “delivery and payment when shipping instructions are delayed,” is of no help, because in subparagraph (d) it is provided:
The foregoing paragraphs (a), (b) and (c) shall apply to partial deliveries of completed articles during the term of the contract only if such partial deliveries are required or permitted by the terms of the contract as to delivery.
This provision was a part of the standard “Procurement Division Contract Terms No. 6,” which defendant had said, in accepting plaintiff’s proposal, would be incorporated in the formal contract. It has no application to the present controversy.
There is no other provision of the contract that has any bearing on the controversy.
The construction of the contrapt by the parties, however, clearly shows that both of them understood that defendant was not obligated to accept delivery until after the test of the completed crane had been, or should have been, made.
The contract was executed by plaintiff on September 11, 1945. On October 20,1945, plaintiff wrote defendant a letter, in which it said:
In connection with the above noted contract, we have requested shipping instructions which seemingly are not available at this time. Consequently, it is imperative that we make arrangements to store completed equipment. Inasmuch as our eontraot does not 'provide for this storage, we would appreciate receiving an amendment to the contract authorizing us to provide for such storage facilities at a price to be negotiated and mutually satisfactory. [Italic ours.]
On November 29,1945 plaintiff’s president wrote the company’s agent in Washington, District of Columbia, instruct *309 ing him to secure an addendum to the contract containing the following provisions:
1. Contract time extended to May 14,1946 as agreed.
2. Partial shipments can be made as completed.
3. In order to allow partial shipments, it shall be provided that the last crane will be the one to be erected and tested in this country.
4. Warehousing of any parts that are held for shipment shall be for the account of Treasury Procurement.
5. The Contractor agrees that subject to the certification of his erection supervisor, any defects or misfits found in his work after it has been delivered in France will be rectified by him without charge to the Purchaser.
No such addendum was ever made, although afterwards, and on at least four different occasions, the contract was amended in other respects.
Again, on April 16, 1946, plaintiff wrote defendant, in which it said:
We have been unable to procure shipping instructions from the French Supply Council in connection with the various parts of the above noted contract.
* * * ‡ ❖
We are now in a position where our plants and yards are becoming overloaded with the various parts of the cranes and pontoons. We therefore kindly request that you contact the French Supply Council and forward to us firm shipping instructions so that delivery may be started.
In reply to this letter, defendant said:
It is impossible to issue shipping instructions at this time inasmuch as the contract stipulated that one machine would be successfully operated in a test run. * * *
Then, on April 27 plaintiff wrote defendant, in which it said:
_ Reference 2. — We respectfully request your permission to ship completed portions of the subject contract to your warehouse or stock yard pending shipment overseas as our plants and yards are becoming overloaded with completed portions of the cranes and pontoons.
In reply, defendant wrote plaintiff a letter in which it said:
*310 Receipt is acknowledged of your letter of April 27, 1946 in reply to Procurement Division letter of April 23, 1946, in which you request shipping instructions in order to relieve your storage. facilities at your plant.
A letter has just been received from the French Supply Council, Chief of Maritime Port Equipment, advising that they will supply shipping marks so that the different parts could be satisfactorily marked to insure the best results in shipping. Therefore, the marking instructions are being prepared and will be forwarded, to you under separate cover. It may be possible that shipping instructions may be submitted at this time. . However it is not to be construed that these shipping, instructions are to be used for the shipping of the machines at this time, as the contract provides that one of these machines is to be successfully operated in a test before any shipment of any crane can be made.
With regard to your request for permission to ship completed portions of the cranes to a Procurement Division warehouse, you are advised that there are no such warehouses available, and it would be impossible for the Procurement Division to negotiate a contract for such a warehouse or otherwise store completed sections. It would also prove unsatisfactory to move this equipment to one of the staging areas due to the cost of moving and handling the equipment from your yards. It is therefore suggested that arrangements be made for a test of one completed crane, at which time arrangements may be made to have the items prepared for shipment.
Again, on July 9,1946, plaintiff wrote defendant a letter, in which it said:
Unfortunately this tremendous tonnage, which we can ill afford to store, is now seriously handicapping the progress of our work to the extent that we request your cooperation in endeavoring to find a suitable outside storage pending shipping instructions.
As we informed you, we shall be glad to pay any reasonable storage charges. You have suggested that it might be possible to make arrangements for temporary storage at some of the Army depots that may not be too overcrowded.
Recently we sent to you a copy of a letter received from Gibbs and Hill, dated June 28, 1946, wherein they request copies of certain drawings which they intend to send to France to prepare for the proper erection and launching of the barges. These barges have been completed for many months past, and if we could store the *311 barges alone, it would relieve our shops of approximately 3,500 tons of fabricated steel.
We shall appreciate any assistance that you may be able to render in this matter. [Italics ours.]
On August 16, 1946, plaintiff wrote defendant requesting it to permit plaintiff to ship the twelve barges on which the cranes were to be erected.
In reply, defendant wrote plaintiff, in which defendant, said:
In view of the fact that these barges are congesting your shops and will play no part in the actual test operation of the crane, you are authorized to ship upon receipt of proper shipping instructions from the Procurement Division. It is therefore suggested that you apply to the regional office in New York for shipping instructions.
The acceptance of delivery of these barges is in noway to be construed as an acceptance of the complete machine as it will be necessary to make a complete test of one crane before the acceptance of all cranes.
All of this goes to show that both parties understood that there was no obligation on defendant to accept delivery of parts of the cranes until after a complete crane had been assembled and had satisfactorily passed the test.
It is clear that they understood that the cost of storing and caring for the completed parts in the meantime was the responsibility of the plaintiff. This is clearly shown by the foregoing quotation from plaintiff’s letter of July 9 to defendant, in which it said:
Unfortunately this tremendous tonnage, which we can ill afford to store, is now seriously handicapping the progress of our work to the extent that we request your cooperation in endeavoring to find a suitable outside-storage pending shipping instructions.
As we informed you, we shall be glad to pay any reasonable storage charges. * * *
This would seem to dispose of plaintiff’s claim for storage charges up to the time the parties met in New York City on December 19, 1946 to arrange for a test of a completed crane.
At that time defendant proposed a test of the crane, which plaintiff claimed went beyond the test required by the con *312 tract, and for this reason it refused to participate in the proposed test. Whether or not the proposed test was within the scope of the contract is not easy to determine.
Under section 3, headed “Main Characteristics of the ■Cranes,” the test to which the crane was to be subjected was set out in detail.
The Test Agenda proposed by defendant on December 19, 1946, went into much greater detail than the test set out in the contract. However, defendant claims that it was within the scope of the test set out in the contract, and, even if this is not so, it was justified, because the luffing mechanism proposed to be used by plaintiff had not been “in successful ■operation for at least one year,” at least in this country, as required under section 5 relating to structural work, and as required under section 8 relating to electrical work. At .any rate, since the luffing mechanism proposed was one with which defendant’s engineers were not acquainted, they were uncertain of its operational efficiency, and they wanted to make sure, by what they regarded as necessary tests, that it would operate satisfactorily. They say the proposed test was justified for the additional reason that the manufacturer •of the Gray Marine Diesel engines, which plaintiff proposed to use, had stated that it was a “souped-up” version of the regular model, and concluded that it did not desire to recommend the operation of the engine at 1800 BPM, the required speed, in continuous service without further details ■as to the nature of the application.
The tests provided for were tests made necessary by plain-til’s failure to provide a luffing mechanism and other mechanical devices which had been in successful operation for a year.
They were perhaps justified under subparagraph (c) in •section 3-07, relating to “test of proper functioning and «efficiency.” This paragraph reads:
(c) The brakes shall not show any abnormal heating. Moreover, either during the course of the tests described above, or apart from these tests, all necessary investigations required to malee sure that the principal equipment and accessories are well established shall be undertaken. In particular, the proper operation of the brakes, of the limiting devices and of the bucket shall be tested as well *313 as the precision of the hoisting operations, the slewing and luffing in a general way. [Italics ours.]
That the tests required by the defendant were justified seems to be confirmed by what followed the refusal of the plaintiff on December 19 to submit the cranes to the tests-proposed.
On December 28 plaintiff wrote the defendant that the American Bureau of Shipping had subjected the cranes to the tests provided for in the contract, and that they had certified that they operated satisfactorily, and that they had issued a test certificate, which plaintiff construed to be a certificate of satisfactory operation, and they, therefore, asked for shipping instructions.
Following this, defendant on January 8,1947, wrote plaintiff asking it to state exactly what features of defendant’s-proposed tests were considered to be beyond the contract specifications. Plaintiff replied generally that all tests not specifically listed in the contract were beyond the contract, terms.
On February 19, 1947 defendant wrote plaintiff that it thought that the tests proposed were within the scope of the contract, and asked plaintiff when it would be ready to submit the crane to this test. Plaintiff treated this letter as a decision of the contracting officer on the dispute, and took an appeal to the head of the department, but the head of the department refused to rule on it, stating that the party who had written the letter of February 19, 1947 was-not the contracting officer, and that, if the parties could not agree on the matter, he would have the dispute submitted to the contracting officer for a decision on all questions of fact, such as the question of whether or not the level luffing arrangement, and the generating power plant had been in. successful operation for at least one year.
Nothing further was done unitl June 5, 1947, when defendant again inquired of plaintiff when it would submit, the crane for the test proposed. In reply, plaintiff again asserted that the proposed test was beyond the terms of the contract.
Then, on July 15, the contracting officer wrote plaintiff,, finding that the—
*314 * * * Test Agenda to be conducted on a Prototype Barge Mounted Crane constructed in accordance with, said contract (a copy of which Test Agenda has previously been furnished to you) are entirely within the scope of said contract.
Demand is therefore again made that said crane be tested according to said tests, without further delay.
Plaintiff made no further protest, and on August 14,194T submitted the crane to the test defendant had demanded.
Plaintiff’s acquiescence in the contracting officer’s decision tends to confirm defendant’s construction of the contract. The detailed tests insisted upon by defendant were made necessary because plaintiff supplied essential parts that had not been in successful operation for a year, and this made it necessary for defendant to invoke the provision of section 3-07 of the contract, reading, “all necessary investigations required to make sure that the principal equipment and accessories are well established shall be undertaken.”
On the whole, we are of the opinion that the test demanded was proper and, therefore, that defendant is not liable for the cost of storing the parts until the test was actually made. After the tests had been made, shipping instructions were issued in due course.
It follows that plaintiff is not entitled to recover for the storage charges which it claims, nor for reconditioning the parts which had become rusted, nor for insurance premiums ■on the parts prior to delivery, nor its legal expenses in defending the proceedings to dispossess it from the yard upon which some of the material was stored. However, plaintiff is entitled to recover the following items.
Some of the parts were manufactured by a subcontractor in Phoenixville, Pennsylvania. Upon acceptance of these items by defendant, it paid for their shipment by rail to New York for export. Since plaintiff was obligated to make ■delivery to defendant at its Long Island City plant, defendant charged it with freight expenses in the amount of $2,099.27, and withheld this amount from the sums due it. The amount withheld was in excess of the actual freight •charges as shown by the bills of lading, in the amount of $799.67. This sum plaintiff is entitled to recover.
*315 At defendant’s request, plaintiff provided a crew of men to load the crane parts on lighters to be furnished by defendant. Defendant delayed in providing the lighters, and plaintiff was accordingly required to pay the sum of $2,531.08 for standby labor. Plaintiff is entitled to recover this amount.
• There is a balance remaining due on the contract price of $2,590.96. This amount plaintiff is also entitled to recover.
Judgment will be entered against the defendant in favor of plaintiff in the sum of $5,921.71.
It is so ordered.
Laeamoee, Judge; Madden, Judge; Littleton, Judge; and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Eoald A. Hogenson, and the briefs and arguments of counsel, makes the following findings of fact:
1. Plaintiff is a New York corporation which at all times pertinent to this case had its offices at Brooklyn, New York, its main plant at Long Island City, New York, and a smaller plant at Ampere, New Jersey.
2. During August 1945, conferences were held between plaintiff represented by its president, and its Washington, D. C., agent, and the defendant represented by the Chief Purchasing Officer, Group 4, Heavy Machinery and Equipment, Procurement Division, Treasury Department, at Washington, D. C., concerning the manufacture of 12 diesel-electric self-propelled barge-mounted cranes to be supplied to the French Government under the lend-lease program. In these conferences it was understood by the parties that the cranes which were to be identical were to be manufactured in prefabricated sections or parts which were to be packed and shipped to France for assembly by others overseas. One of the cranes was to be assembled for testing, and then dismantled and packed in sections or parts for shipment. The defendant’s representative explained that the lend-lease program might expire on December 31, 1945, asserted that completion of the project by that date was necessary, and from *316 that standpoint, questioned plaintiff’s representatives in detail concerning availability of supplies, materials, machinery and equipment. Plaintiff advised that it had contacted suppliers and subcontractors and planned to award subcontracts as plaintiff developed the design and detailed drawings. Plaintiff explained that the test crane would be the “last crane” because the contract could not be performed within the time allowed if only one crane were constructed and tested before the other crane parts and sections were manufactured. Defendant’s representative made no objection to the manufacture of all crane parts before assembly of a test crane. The evidence does not establish that there were any statements made by either party as to whether plaintiff was to deliver and the defendant to accept 11 cranes prior to the erection and test of one crane. It was proposed by plaintiff and rejected by defendant’s representative that the erection and testing of one crane be accomplished overseas by plaintiff after shipment of all cranes.
3. By letter dated August 13, 1915, plaintiff submitted to defendant its written proposal for the construction of the 12 floating cranes, as follows:
1. We propose to construct 12 floating revolving cranes in conformance with yóur specifications, dated May 21j 1945, as issued by the Mission of Public Works and Railroads of the French Supply Council, complete with maintenance tools, final _ drawings, instruction books, and including the erection and testing of one crane complete with barge for the lump sum of $128,-426.00 per unit.
2. We propose to design 12 floating cranes complete with barges in conformance with your specifications noted above, and including all necessary shop drawings required to fabricate both the crane and barge at cost not to exceed $4,000.00 per crane on the basis of 12 cranes.
3. We propose to furnish the necessary packing for the cranes and barges in accordance with your specifications as amended by your telegram, dated August 7, 1945, for the lump sum of $3,180.00 per unit.
4. We propose to furnish spare parts for the above noted 12 cranes at a price not to exceed 5 percent of the cost per unit.
*317 We acknowledged herewith receipt of your amendment to the specifications and your telegram of August 7 also in connection therewith.
The above prices are f. o. b. our shop Long Island City, New York. Satisfactory terms of payment to be arranged. Delivery of these 12 floating cranes and barges can be made by December 31, 1945, providing suitable priorities can be obtained to release any critical materials. In this connection, it is noted that for the steel plate and shapes it is our intention to use surplus Government steel (new). It should be noted, however, that test of the test unit cannot be effected until February 1946.
We further call your attention to the fact that, while our price is f. o. b. our plant, if you can make arrangements to dock your carrier alongside our dock, we shall load this equipment on your carrier at no extra charge.
4. By letter dated August 20, 1945, defendant accepted plaintiff’s proposal as follows:
In accordance with your quotation of August 14, [sic] 1945 the following is accepted: Twelve (12) Diesel electric barge mounted cranes complete with spare parts,
F. O. B. Long Island City, New York, Packed for export.
Approx. Total $1,656,327.60
This is your authority to proceed with manufacture under contract number cited above, [DA-TPS-92430] copies of which will be submitted for your signature, Procurement Division Contract Terms No. 6, dated November 1, 1944 being incorporated therein. This offer is accepted on the basis of the following delivery as stated in your quotation.
Complete by December 31, 1945
$ ‡ ‡ ‡ #
5. By letter dated August 30,1945, defendant transmitted a. formal quotation to plaintiff prepared for signature, with the instruction that all changes were to be initialed by plaintiff’s officer executing the contract. This formal quotation, designated thereon as Contract DA-Tps-92430, was executed by plaintiff in September 1945, and thereafter on September 20, 1945, endorsed as “Accepted by the Government” by the Special Assistant to the Director, Procurement Division, Treasury Department.
*318 As executed by both parties, the formal quotation provided :
The undersigned offers to furnish, at the prices stated, the following:
6.6 Diesel Electric Self Propelled Barge mounted cranes. All to be as described and specified on the following continuation sheets.
Grand Total Boxed for Export $1,579,272.00
F. O. B. Point of Manufacture with freight allowed to contractor’s plant at Long Island City, N. Y.
AA-3 Preference Bating: Allotment Symbol L-3 are hereby applied to this contract.
Total Approximate Weight Per Unit
Gross 526,000 lbs. Net 500,000 lbs.
This contract will be amended at a later date to include spare parts.
It is understood that deliveries under this contract are to be completed by December 31,1945. If any portion of the above is not delivered by this date, the government reserves the right to cancel the undelivered portion without charge, for such undelivered portions.
$ ‡ # Hí $
delivery : complete by December 31,1945
Discount none percent_calendar days.
This offer includes the “Procurement Division Contract Terms,” No. 6 dated Nov. 1, 1944, on file with the Director of Procurement, a copy of which has been received by the undersigned.
The contractor certifies that the price or prices quoted herein for the articles or services to be furnished hereunder are not in excess of any existing applicable maximum prices established by the Office of Price Administration. The attached continuation sheets from page 2 to 23 and forms PO-14, PO-57, PO-467, 380A are made a part hereof.
The defendant’s transmittal letter contained the request that no changes be made in the articles provided in Procurement Division Contract Terms No. 6.
6. Under Section 1 of General Clauses of the contract, set forth on the continuation sheets attached to the formal quotation, the parties agreed as follows:
1-01. Scope of the Contract. The Contract shall include design and construction of 12 floating revolving cranes of 6 metric ton capacity, as well as the supply off *319 maintenance tools, of spare parts and of final drawings.
One crane out of 12 cranes of 6 metric ton capacity shall be erected, complete with barges, and tested in accordance with procedure described in Section 3-07. After satisfactory completion of the tests the cranes and barges shall be again disassembled and prepared for shipping.
*****
1-06. Approval of Drawings. Before commencing the fabrication of any of this work the Contractor shall submit for approval to the Purchaser or to his Engineer, drawings and calculations as follows:
(1) General arrangement drawing showing hook lifts, radii and clearances of the floating cranes, as well as maximum lists of the barge occurring at various loading conditions.
(2) General arrangement drawing of machinery house of the crane, showing windows, doors and machinery clearances.
(3) General arrangement drawing of the barge, showing the installation of machinery, tanks, pumps, ballast, deck fittings, etc.
(4) General arrangement of each separate hoisting, luffing and rotating mechanism, showing sizes and loads of gears, reducers, shafts, bearings, turntables, materials of construction, speed.
(5) Stress sheets of boom, A-Erame, turntable and supporting structures, showing stresses and sections.
(6) Arrangement of ladders, platforms and walks, showing size and material.
(7) Arrangement of ropes for hoisting and luffing, showing size of sheaves, rope leads, size of bearings and loads.
(8) Weights and centers of gravity of all principal parts of the crane and of the barge, based on computed weights from the detail drawings, to show the stability of the crane and of the barge.
(9) General drawings of engines, sizes and description of all brakes, clutches and dogs and similar parts.
(9a) Diesel electrical cranes, general drawings of motors, wiring diagrams, characteristic curves, sizes and description of all brakes, controllers, limit switches and similar parts.
(10) All structural and mechanical shop detail drawings referring to construction and machinery of the crane and of the barge.
*320 1-09. Inspection. The Purchaser reserves his right to take whatever measures he shall deem necessary in order to supervise the construction and erection of cranes and barges.
To this effect, during the entire period of manufacture of the equipment, the Purchaser or his Agents shall have all the necessary facilities in order to inspect in the manufacturer’s plant the preparation and utilization of materials.
The Contractor shall supply, free of charge, written reports of physical properties of various materials used for crane construction, as determined by tests, as well as mill reports on the structural steel, shafting, etc. In no case shall the fact of inspection during construction be construed by the manufacturer as relieving him of his guarantee, as stipulated in Section 1-08.
Other pertinent parts of the contract, contained in Procurement Division Contract Terms No. 6, were as follows:
ARTICLE 7. INSPECTION AND TEST.
(a) All material and workmanship shall be subject to inspection and test at all times and places, and, when practicable, during manufacture.
. (h) All inspections and tests by the Government shall be performed in such a manner as not unduly to delay the work.
(c) If inspection and test, whether preliminary or final, is made on the premises of the contractor or subcontractor, the contractor shall furnish, without additional charge, all reasonable facilities and assistance for the safe and convenient inspections and tests required by the inspectors in the performance of their duty.
(d) If, upon inspection, any article be found defective, the Government may cause such defective condition to be corrected and charge the cost thereof to the contractor.
(e) If public necessity requires the use of materials or supplies not conforming to the specifications, they may be accepted and payment therefor shall be made at a proper reduction in price.
article 8. payment. The contractor shall be paid upon the submission of properly certified invoices or vouchers at prices stipulated m the contract for articles delivered and accepted or services rendered less deductions, if any, as herein provided. Unless otherwise specified, payments will be made on partial deliveries *321 accepted by tbe Government, provided that unit prices are stated in the contract for the articles so accepted.
* ‘ * * * *
ARTICLE 10. DELIVERY AND PAYMENT WHEN SHIPPING INSTRUCTIONS ARE DELAYED.
{a) If within 20 days from receipt of the contractor’s written notice requesting instructions for shipping completed articles under the contract, the Government shall not furnish such instructions to the contractor, the contractor may elect to deliver such articles to the Government at the factory where such articles have been manufactured or produced. Upon receipt of the contractor’s written notice of such election, the Government shall remove from the factory such of said articles as are acceptable under the contract or make arrangements satisfactory to the contractor for the storage of such acceptable articles on the premises of the contractor. All such articles stored on the premises of the contractor shall be kept separate from all other goods or articles. The contractor will be required to absorb such part of the cost incident to the transfer of such articles from factory to storage, either on or off the premises of the contractor, as would be equal to the expense which the contractor would be obliged to incur in effecting delivery to common carriers under normal conditions.
(5) When such articles are delivered f. o. b. cars or trucks at the factory, if such articles are to be removed from the premises of the contractor, or when such articles are stored on the premises of the contractor, if satisfactory arrangements for such storage are made, the contractor shall deliver to the Procurement Division representative at the factory the contractor’s affidavit as to the quantity and condition of such articles. Upon such delivery or such storage and upon acceptance by such Procurement Division representative of said affidavit, the title to such articles shall pass to the Government.
(c) Payment for all such articles delivered to and accepted by the Government pursuant to this Article shall be made in accordance with the contract, subject to the condition that if the contract price includes transportation charges from the contractor’s shipping point to any other point, the price to be paid for such articles shall be determined by deducting from the unit prices stated in the contract the cost of shipping such articles from the designated shipping point to the designated *322 delivery point, based upon the lowest freight rate on file with the Interstate Commerce Commission, the various. State commissions, or the United States Maritime Commission, or published by the Post Office Department,, applicable between said two points on the date of delivery, and the total contract price shall be correspondingly reduced.
(d) The foregoing paragraphs (a), (&) and (c) shall apply to partial deliveries of completed articles during-the term of the contract only if such partial deliveries are required or permitted by the terms of the contract as to delivery.
‡ ^ ^
ARTICLE 12. disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be-decided by the contracting officer, subject to written appeal by the contractor within 30 days to the Secretary of the Treasury or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance.
7. During the contract performance, four amendments to-the contract were executed by the parties, summarized as follows:
Amendment No. 1, signed by plaintiff on January 7,1946, and by defendant’s Special Assistant to the Director, Procurement Division, Treasury Department, on January 11,. 1946, extended the contract completion date to May 15,1946.
Amendment No. 2, signed by plaintiff on March 15, 1946, and by defendant’s Acting Special Assistant to Director, Procurement Division, Treasury Department, on March 22, 1946, changed the specifications with respect to speeds of operation of rotation and luffing mechanisms, and also provided for minor changes in the structural work of the cranes,, for all of which an increase in contract consideration was allowed in the sum of $26,400.
Amendment No. 3, signed by plaintiff.on July 12, 1946, and by defendant’s Acting Special Assistant to Director, Procurement Division, Treasury Department, on July 26, 1946, extended the final delivery date to August 20,1946.
Amendment No. 4, signed by plaintiff on February 17, *323 1947, and by defendant’s Special Assistant to Director, Procurement Division, Treasury Department, on February 26, 1947, provided that the barges would not be equipped for self-propulsion, reduced the contract price by $7,252.80, and permitted repossession by plaintiff of certain self-propulsion equipment previously delivered to defendant.
8. By letter dated September 11, 1945, with which plaintiff transmitted the signed copies of the contract to defendant for execution, plaintiff proposed various deviations from specification requirements, but made no mention of delivery of completed crane parts or sections prior to the testing of one crane, but, regarding partial payments of the contract price, it requested addition of the following language:
At least once a month partial payments are to be made as the work progresses. Estimates of payments will be made by the Contractor and approved by the Government Inspector and will cover raw materials and sup-Elies received, work in process and work completed at oth the Contractor’s and Subcontractor’s plants.
Plaintiff’s request concerning partial payments was never made the subject matter of a formal amendment to the contract nor otherwise allowed by the defendant.
On page PO-380-A of the continuation sheets of the contract, the parties had agreed with respect to progress payments as follows:
From time to time, but not more frequently than monthly, the contractor may submit to the contracting officer a statement certified by the contractor showing the degree of completion of the work and supplies required under this contract and the estimated value of said work and supplies in their then state of completion, based upon the total contract price. In preparing such estimated [sic] materials delivered at the contractor’s factory for use in performance of the contract may be taken into consideration.
Properly certified invoices shall also be submitted with said statement.
Upon approval of said statement by the contracting officer, the contractor shall be paid [obliteration] of the amount of such estimated value of said work and supplies, after deduction of the total amount of all payments theretofore made to the contractor under the con *324 tract. Any dispute as to the amount of such payment or as to the estimates in the statement submitted by the contractor shall be referred to the Director of Procurement, whose decision thereon shall be final.
All materials and work for which such partial payment has been made shall, upon the making of such payment, and all other materials and work shall, upon being combined or assembled therewith, become and remain the sole property of the Government. The provisions of this paragraph shall not be construed, however, as relieving the contractor from the sole responsibility for all such materials and work until acceptance of the finished articles required by the contract, or for the restoration of any materials, work, or articles damaged prior to such acceptance, or as a waiver of the right of the Government to require the fulfillment of all the terms of the contract.
Upon final delivery to and acceptance by the Government of all articles provided for in the contract, the contractor shall be paid the remainder of the contract price after deduction of the total amount of all the partial payment theretofore made to the contractor as here-inabove provided.
The Government or its representative shall at all times be afforded proper facilities for the inspection of the work and shall at all times have access to the plant or factory or other places of the contractor wherein the work is being prosecuted, to all work in progress, to all materials which the contractor has in hand, and to all books, records, correspondence, instructions, and other records of any description pertaining to said work. The contractor shall preserve all the books, records, and other papers hereinabove described for a period of two years after completion or cessation of work under this contract.
It is agreed that until final inspection and acceptance of all the articles required under the contract, no prior inspection, payment, or act is to be construed as a waiver of the right of the Government to reject any such articles which are defective or which do not comply with all the requirements of the contract.
9. Plaintiff proceeded with the preparation of the drawings required by the above-quoted paragraph 1-06 of the contract and submission of them to the engineers of the French Mission as required by the specifications, and also placed subcontracts and commenced fabrication of crane parts.
*325 In a letter dated October 1,1945, plaintiff advised defendant of progress being made and requested “shipping instructions as provided in the contract.”
By letter dated October 2, 1945, plaintiff wrote to defendant as follows:
In accordance with provisions of the above noted contract, we are requesting shipping instructions for the various cranes involved.
We expect to have parts ready for shipment starting October 20, 1945, and will continue thereafter until completion which is scheduled on or before December 31, 1945.
In addition to destinations, etc., we should like to have you advise us as to what special markings will be required on the various parts.
We also request a supply of U. S. Lend-Lease tags and labels which are understood we are to requisition from the Regional Inspection Office. However, if you have any available, please let us have same.
10. By letter dated October 20, 1945, plaintiff wrote to defendant as follows:
In connection with the above noted contract, we have requested shipping instructions which seemingly are not available at this time. Consequently, it is imperative that we make arrangements to store completed equipment. Inasmuch as our contract does not provide for this storage, we would appreciate receiving an amendment to the contract authorizing us to provide for such storage facilities at a price to be negotiated and mutually satisfactory.
We also attach a copy of our proposal on which the subject contract is based. Herein you will note that it was our intention to make delivery of the 12 units by December 31, and erect the test unit within two months thereafter. Accordingly, we also request that you incorporate this provision into the amendment as obviously, if erection of the test unit is demanded first before the manufacture of the other 11 units, it would be obviously impossible for us to make delivery as provided for in contract.
Will you, therefore, kindly let us have these amendments to the contract as soon as possible in order that there will be no misunderstanding with the French Government as to both your and our intentions in this matter.
*326 By letter dated October 22,1945, prepared by defendant’s Chief Purchasing Officer previously mentioned in finding 2, but signed by the Chief, Contract Division, Procurement Division, Treasury Department, defendant wrote to plaintiff as follows:
This office is advised by Gibbs & Hill, Inc., Consulting Engineers for the French Mission of Public Works, that there is a delay on the part of your company in submitting original drawings and also revise drawings when requested, in accordance with the contract.
Please give this matter your close attention in order to avoid any unnecessary delay and expedite delivery. It is also important that you immediately give this office a detailed report on this phase of the work.
In regard to the erection and testing of one crane in accordance with the contract, Page 2, Section One, General Clauses, which reads as follows: _
_ “One crane out of 12 cranes of 6 metric ton capacity shall be erected, complete with barges, and tested in accordance with procedure described in Section 3-07. After satisfactory completion of the tests the cranes and barges shall be again disassembled and prepared for shipping.”
It is the understanding of this office that you intend to make the erection and test of this crane in France. The French Mission of Public Works request that all tests be made at your plant as soon after December 31, 1945, as possible.
Therefore, you will arrange to erect and test one complete barge and crane at your plant or other convenient location after all tests are completed, disassemble same and box for export. It is agreed that the delivery date of December 31,1945, shall not apply to this particular crane.
By letter dated October 22, 1945, plaintiff wrote to defendant as follows:
To date we are making very satisfactory progress on the above noted contract, and at this time we are ahead of our schedule calling for delivery of all equipment and materials by December 31,1945.
However, at this late date Gibbs and Hill, Inc., the engineers for the French Mission, seek changes and additions to the contract which would materially affect the delivery date and make necessary new price negotiations.
We have no objection to making changes as such, pro *327 viding we are compensated for same and the completion date is properly extended. What we are offering is. in our opinion in strict conformance with the contract and specifications, although in some instances Gibbs and Hill, Inc., do not concur.
If you approve of these changes and additions, kindly advise us what method of extra price adjustment we should use and what provisions for an extension of time can be arranged.
Pending your directions, we are proceeding in strict conformance with the contract as now written.
11. By letter dated October 23, 1945, plaintiff wrote to defendant as follows:
Your New York Inspection District requests that we furnish them with drawings approved by the French Engineers, Gibbs and Hill, Inc., before they can release materials at the various points of manufacture.
Gibbs and Hill, Inc., however, will not give us approval except on the job as a whole. For instance, on the barges which are now about 70 percent completed, we proceeded on the approval given us to [sic] by the American Bureau of Shipping as provided for in the contract specifications. Gibbs and Hill, Inc., however, withhold their approval until such time as all the drawings including stability drawings have been completed.
It is impossible for us to furnish a final stability drawing until such time as we definitely know what the total weight of every component part of this crane will be, which information we do not as yet have completely.
_ Accordingly, will you notify your New York Inspection District to make the necessary inspections and releases so that we can get materials shipped as contemplated in our progress schedules.
By letter dated November 2, 1945, plaintiff also wrote to defendant as follows:
"We have been informed by Mr. Baber of your New York office that it will be necessary for him to receive certain instructions from you before he can approve our requisitions for progress payments on Contract ifeDA-Tps 924340. [sic]
Specifically he wishes to know:
(a) Which of the 12 cranes is to be erected for test purposes; or whether all cranes can be fabricated and the last crane erected and tested. In this connection attention is invited to your recent letter to us advising that the last crane should be that one chosen for erection.
*328 (b) If it is necessary for him to have copies of drawings approved by the purchaser before this test is conducted.
(c) If the lack of shipping instructions will prevent him from approving progress payments.
Inasmuch as the contract period is half over and we have completed approximately one-half of the contract without as yet having received any payments, it is of the utmost necessity that prompt relief be given and immediate payments be authorized as per the intent of our contract.
By letter dated November 8,1945, plaintiff again wrote to defendant as follows:
We refer to our letter of November 3rd, [sic] wherein we requested your advice as to whether we should incorporate certain changes in the floating cranes being furnished to you under the above noted contract. These changes, as you will recall, were requested by Gibbs & Hill, Inc., the Engineers for the French Government, in their letter to us of October 30th, copy of which was forwarded to you with our letter of November 3rd. [sic]
We were advised at our previous meeting with you that the Procurement Division had requested the representatives of the French Mission to formally present their request for desired changes and additions to the contract which they had informally initiated.
Lack of this information to date has already caused serious delay. Since we are holding up certain of the shop fabrications awaiting your instructions, your immediate decision is again requested so that continued delay may be averted.
12. In reply to plaintiff’s foregoing letters requesting shipping instructions and complaining because the engineers for the French Mission required submission of all drawings before approval of any, defendant’s Deputy Director in charge of Purchase Branch, Procurement Division, by letter dated November 15,1945, wrote to plaintiff in part as follows:
The matter of progress in carrying out the subject contract has been the subject of discussions with you, members of your company and members of the French Supply Council.
The Procurement Division is in receipt of a letter dated November 9, 1945, from the Mission of Public Works of the French Supply Council outlining their *329 views and desires in connection with this contract. The Procurement Division has carefully reviewed the situation.
There has been an apparent misunderstanding in connection with the intent of Sections 1-01 and 1-06 of the contract.
Section 1-01 of the contract requires a test of one crane prior to final acceptance of the 12 cranes involved in the contract. This test is to be carried out as stated in the contract and is to be carried out in the United States. Any defects found in the crane which is tested shall be remedied on the corresponding parts of the other 11 cranes as well as on the one subject to the test.
Section 1-06 is to be adhered to in its entirety which means that you must submit drawings and calculations as described in this section to Gibbs and Hill, Inc., Consulting Engineers, for approval. The Procurement Division cannot properly inspect work accomplished nor approve same for progress payments unless drawings and calculations have received the approval of Gibbs and Hill, Inc., and are available to Procurement Division inspectors. It is understood that the following represents the status of drawings at the present time:
After setting forth in detail the status of submission and approval of drawings concerning general plans and layout, mechanical details, barge design, and stress diagrams, this letter further stated as follows:
It is the understanding of the Procurement Division that the total number of drawings required for the crane is approximately 150, and that to date you have submitted approximately 44 drawings, or approximately one third.
This letter listed various deviations from specifications, advised that the French Mission had agreed to them, stated that the time of completion of the entire contract, including satisfactory completion of the test on one crane, was extended to May 15,1946, and concluded as follows:
It is requested that you take immediate cognizance of this letter and advise this office as to your intentions with regard to carrying out the work contemplated under the terms of your contract, together with the above mentioned deviations and revisions.
*330 13. In reply to the letter quoted and summarized in finding 12, plaintiff by letter to defendant dated November 19,1945, stated in part as follows:
We acknowledge receipt of your letter dated November 15,1945, outlining your views and desires as to the procedures that shall be followed to properly and expeditiously progress the above noted contract.
It is our desire to please both Treasury Procurement by our full cooperation and the French Government by the high quality of our production commensurate with good practice. We find no reason to object to your interpretation of Paragraph 1-01, and go further in stating that, providing our erection supervisor will so certify, any defects or misfits found in our work after it has been delivered in France will be rectified by us without charge.
In view of the deviations and changes in the contract which are contemplated, particularly the proposed extension of the completion date to May 15, 1946, we are agreeable to proceeding with the drawings and calculations before further fabrication is continued.. It should be noted that, heretofore, we went ahead with fabrication before completing the drawings and specifications in order to get the cranes fabricated by December 31, 1945.
We are now ready to proceed with the drawings and computations as speedily as possible and to submit them to Gibbs & Hill, Inc., for approval before any more fabrication is done. Fabrication is presently stopped. It will speed work on the drawings and computations, as well as on the cranes, if prompt agreement is had on the deviations and changes and expeditious action is taken on the drawings and computations by Gibbs & Hill, Inc., when they are submitted to them.
In the main we concur with your analysis of the status of the drawings. There are certain drawings that can be clarified and others that should be further considered. * * *
This letter contained in detail a statement concerning the status of drawings, and concluded as follows:
We have endeavored to cover all points in your letter of November 15th. We believe that this interchange of correspondence, together with the fine cooperation we have received from Treasury Procurement, will greatly expedite the progress of the work by eliminating misunderstandings.
*331 14. By letter dated November 29,1945, plaintiff’s president advised plaintiff’s Washington, D. C., agent as follows:
In conection with, the changes proposed by the Treasury Procurement on the cranes, it will properly resolve itself in an addendum to the contract.
Besides the costs involved, as we have quoted to them, this addendum No. 1 should include the following:
1. Contract time extended to May 15, 1946 as agreed.
2. Partial shipments can be made as completed.
3. In order to allow partial shipments, it shall be provided that the last crane will be the one to be erected and tested in this country.
4. Warehousing of any parts that are held for ship-men shall be for the account of Treasury Procurement.
5. The Contractor agrees that subject to the certification of his erection supervisor, any defects or misfits found in his work after it has been delivered in France will be rectified by him without charge to the Purchaser.
We believe that the above items included in the addendum will clarify the contract to the satisfaction of all concerned. Accordingly, will you please discuss these points with Mr. Oscar Cox so that he may be in a position to word the addendum propery when it is being prepared.
The record does not show whether this proposed addendum was discussed with defendant, and, hence, its position thereon, but none of the amendments to the contract, summarized in finding 7, contained any reference to or language pertaining to the subject matter of items 2 through 5 of this letter. Mr. Oscar Cox was at that time attorney for plaintiff.
The record in this case is silent as to what action, if any, was taken by the plaintiff or defendant pursuant to this communication between plaintiff’s president and its Washington, D. C., agent.
15. By letter dated April 16, 1946, plaintiff wrote to defendant as follows:
We have been unable to procure shipping instructions from the French Supply Council in connection with the various parts of the above noted contract.
Sometime ago the engineers for the French, Gibbs and Hill, Inc., promised to let us have the destination of the 12 cranes so that proper markings could be put on the various pieces as they were completed and *332 painted. To date this information has not been forthcoming.
We are now in a position where onr plants and yards are becoming overloaded with the various parts of the cranes and pontoons. We therefore kindly request that you contact the French Supply Council and forward to us firm shipping instructions so. that delivery may be started.
In reply, defendant by letter to plaintiff dated April 23, 1946, stated in pertinent part as follows:
It is impossible to issue shipping instructions at this time inasmuch as the contract stipulated that one machine would be successfully operated in a test run. In the event you require marking instructions, please advise this office and arrangements will be made to supply you with the proper marking instructions for the components to be shipped under this contract.
In reply, plaintiff by letter to defendant dated April 27, 1946, stated:
REFERENCED : 1. Markings for Contract No. DA-TPS-92430
2. Shipping to Treasury Warehouse or Stock Yard Completed Items on Contract No. DA-TPS-92430
Receipt is acknowledged of your letter of April 23, 1946 responding to our letter of April 16, 1946 with reference to shipping instructions for the floating cranes covered by the above contract.
Reference 1. — It is imperative we be supplied with the proper marking instructions in order to proceed expeditiously.
Reference 2. — We respectfully request your permission to ship completed portions of the subject contract to your warehouse or stock yard pending shipment overseas as our plants and yards are becoming overloaded with completed portions of the cranes and pontoons.
In reply, defendant wrote to plaintiff by letter dated May 6, 1946, as follows:
Receipt is acknow] edged of your letter of April 27, 1946 in reply to Procurement Division letter of April 23, 1946, in which you request shipping instructions in order to.relieve your storage facilities at your plant.
*333 A letter has just been received from the French Supply Council, Chief of Maritime Port Equipment, advising that they will supply shipping marks so that the different parts could be satisfactorily marked to insure the best results in shipping. Therefore, the marking instructions are being prepared and will be forwarded to you under separate cover. It may be possible that shipping instructions may be submitted at this time. However it is not to be construed that these shipping instructions are to be used for the shipping of the machines at this time, as the contract provides that one of these machines is to be successfully operated in a test before any shipment of any crane can be made.
With regard to your request for permission to ship completed portions of the cranes to a Procurement Division warehouse, you are advised that there are no such warehouses available, and it would be impossible for the Procurement Division to negotiate a contract for such a warehouse or otherwise store completed sections. It would also prove unsatisfactory to move this equipment to one of the staging areas due to the cost of moving and handling the equipment from your yards. It is therefore suggested that arrangements be made for a test of one completed crane, at which time arrangements may be made to have the items prepared for shipment.
16. By letter dated July 9,1946, plaintiff advised defendant that it had amassed a large tonnage of fabricated crane parts, and stated further as follows:
Unfortunately this tremendous tonnage, which we can ill afford to store, is now seriously handicapping the progress of our work to the extent that we request your cooperation in endeavoring to find a suitable outside storage pending shipping instructions.
As we informed you, we shall be glad to pay any reasonable storage charges. You have suggested that it might be possible to make arrangements for temporary storage at some of the Army depots that may not be too overcrowded.
Recently we sent to you a copy of a letter received from Gibbs and Hill, dated June 28,1946, wherein they request copies of certain drawings which they intend to-send to France to prepare for the proper erection and launching of the barges. These barges have been completed for many months past, and if we could store the barges alone, it would relieve our shops of approximately 3,500 tons of fabricated steel.
*334 We shall appreciate any assistance that you may be able to render in this matter.
In reply, defendant wrote plaintiff by letter dated July 19, 1946, that as to arrangements for temporary storage at some of the Army depots, necessary inquiries had been made, and that plaintiff would be advised as soon as possible.
17. By letter dated August 16,1946, plaintiff requested defendant to permit it to ship the twelve barges, asserting that it would be necessary that the barges be assembled properly ;and launched in France before the crane structures could be •erected.
In reply, defendant’s Deputy Director in charge of Purchase Branch, Procurement Division, by letter received by plaintiff on September 7, 1946, stated as follows:
This office is in receipt of your letter of August 16, 1946, requesting authority to ship the twelve barges which are now completed.
In view of the fact that these barges are congesting your shops and will play no part in the actual test operation of the crane, you are authorized to ship upon receipt of proper shipping instructions from the Procurement Division. It is therefore suggested that you apply to the regional office in New Tork for shipping instructions.
The acceptance of delivery of these barges is in no way to be construed as an acceptance of the complete machine as it will be necessary to make a complete test of one crane before the acceptance of all cranes.
18. By August 16,1946, plaintiff had substantially erected the test crane structure, but the test could not be held because the electrical brake equipment and luffing reduction gears had not been supplied by subcontractors. By its letter dated August 16, 1946, plaintiff advised defendant that Michigan Tool Company had been unable to complete delivery of the reduction gears because of strike conditions, and with respect .to brakes, stated as follows:
It now appears that, because of conditions beyond our control, namely strikes, etc., we will have to wait a considerable time, perhaps three months, before we can obtain the necessary brakes from the International General Electric Company to operate the test crane.
*335 19. On August 23, 1946, the following report by telegram was made by defendant’s Chief of the Inspection and Expediting Division, Procurement Division, New York, N. Y., to the Treasury Procurement Division, Washington, D. C., setting forth the status of the job at that time:
REURTWX AUG 12 CONTRACT 92430 COMPLETION OF CONTRACT HAS BEEN EXTENDED TO AUG 20, 1946 BY AMENDMENT NO. 3 DATED JULY 1, 1946 LAST INSPECTION MADE AT CONTRACTORS plant/contacted supt. mr. breckenridge/re-VEALED THAT THE TEST BARGE WILL NOT BE FINISHED BEFORE THE MIDDLE OF SEPTEMBER 1946. FINAL DELIVERY FROM SUB CONTRACTOR, GENERAL ELEC CO AND THEIR SUB CONTRACTOR, CUTLER HAMMER EXPECTED BY THE MIDDLE OF OCTOBER AND END OF NOVEMBER 1946. CONTACTED MR. IN-TERMONT AT GENERAL ELEC AND MR. W. H. CONSTELLO, MANAGER, INDUSTRIAL DIV CUTLER HAMMER. AS FINAL DECISION CONCERNING THE ACCEPTANCE OF SUBMITTED GREY MARINE DIESELS AND THE DESIGN OF LUFFING MECHANISM HAS NOT YET BEEN MADE, THESE PARTS HAVE NOT BEEN INSPECTED OR RELEASED. IN CASE THE TYPE OF ENGINES SUBMITTED WILL BE ACCEPTABLE COMPLETION OF CONTRACT MAY BE CALCULATED TO AMOUNT TO NINETY-FIVE PERCENT. REPLY REF 402 S.
20. As reported by the American Bureau of Shipping under date of October 15,1946, various prefabricated sections stored at the plants of plaintiff and one of its subcontractors, Consolidated Shipbuilding Corporation, showed the effect of the elements, with the paint peeling off and rust appearing. It was necessary that these units be scaled, cleaned and re-coated with paint.
21. Defendant in letters dated October 22, 1946, October 24, 1946, and November 7, 1946, informed plaintiff that the condition of the barge plates and bulkheads stored at plaintiff’s Long Island City plant and at Consolidated Shipbuilding Corporation was not satisfactory and that it was necessary to recondition, rebundle and remark them before the Treasury Department would accept them. Defendant further advised that plaintiff’s suggestion that the work of cleaning, painting and rebundling be deferred until the time of moving the material for shipment was not satisfactory because the time required would be about 20 working days of eight hours each while employing two crawler cranes, *336 each with a five-man crew, and requested plaintiff to proceed with the refinishing at once.
In the meantime, by letter dated October 31, 1946, to defendants Deputy Director in charge of the Purchase Branch,. Procurement Division, plaintiff requested that the additional cleaning and .painting be paid for by the defendant as an extra under the contract. This official, by letter dated November 7,1946, advised that the Procurement Division would not pay any additional money for the cleaning and repainting, and requested that plaintiff proceed immediately with such work.
By letter dated November 25, 1946, plaintiff advised the Procurement Division at Washington, D. C., that its only objection to repainting the barge plates was that it would, have to handle this material twice, and stated that it would proceed with repainting of parts as they were in process of' being moved for shipment.
A year later, by letter dated December 8, 1947, in which plaintiff acknowledged receipt of defendant’s letter of December 3, 1947, requesting refinishing of fabricated sections,, plaintiff advised that it would proceed with the refinishing of materials under protest with reservation of the right to-recover the cost entailed, plus a reasonable profit.
22. By letter dated November 22,1946, defendant notified, plaintiff that it was still in default in submitting a test report covering batteries to be used in connection with the lighting equipment. Plaintiff’s president had orally promised to have the tests made by a recognized laboratory. Defendant further advised that plaintiff was in default in submitting specified drawings to the consulting engineers of the-French Mission, which had been previously requested in defendant’s letters dated August 13, 1946, and September 24, 1946, and in a letter from the engineers for the French Mission, dated May 9, 1946. Defendant also stated that plaintiff had failed to comply with defendant’s request of October 2, 1946, to submit certified test reports from the manufacturers of the Gray Marine Diesels and Allis Chal-mers Generators, and further asserted that such reports were mandatory before visual inspection of the engines and gen *337 erators could be made and such equipment released for shipment after obtaining results from the test crane.
In the same letter, defendant notified plaintiff that it was willing to accept the luffing mechanism as designed by plaintiff if and when the test proved satisfactory, and further stated as follows:
* * * In addition to the one unit shipped to your place on your responsibility by Michigan Tool there are, according to information received from our Detroit office on October 22, 1946, five units ready. All other work on the balance has been stopped and * * * report is expected at the end of this month. Please inform this office of the status of your order with Michigan Tool on this subject.
It will be necessary that the test crane be provided with a bucket for the load. Arrangements have been made for a bucket to be shipped to your place by the French Mission for Public Works and we assume that all cables necessary for this purpose can be provided from your stock. We expect you to make the necessary provisions without any delay for the test is expected to take place not later than December 10,1946.
23. During the contract performance, plaintiff submitted to defendant various requisitions for partial payments of the contract consideration for furnished labor and materials. The sum of money sought on each requisition was based on the enumerated percentages of completion of the various sections of the floating cranes at the end of each requisition period, as applied to the enumerated values of the sections when completed, with each requisition in turn eliminating work covered in the previous requisition or requisitions. Thus, at the end of each requisition period, plaintiff computed the value of all completed work and materials on a percentage-of-completion basis, and then deducted therefrom the amounts of the previous requisitions. From the remaining balance, plaintiff deducted 10 percent as the sum to be retained by defendant until final settlement, and the remainder was the amount of the payment sought in the requisition.
With transmittal letter dated October 9, 1945, plaintiff submitted Requisition #1 covering performance through September 15,1945, in the net amount of $62,640.
*338 With transmittal letter dated October 30, 1945, plaintiff resubmitted Requisition #1 and submitted Requisition #2 covering performance after September 15, 1945, to October 15,1945,in the net sum of $800,834.
With transmittal letter dated November 16,1945, plaintiff submitted Requisition #3 covering the period after October 15.1945, to November 15,1945, in the net sum of $332,753.40.
With transmittal letter dated December 19, 1945, plaintiff submitted Requisition #4 covering the period after November 15, 1945, to December 15, 1945, in the net sum of $187,855.74.
During the latter part of January 1946, plaintiff submitted Requisition #5 covering the period after December 15,1945, to January 15,1946, in the net sum of $288,785.57.
With transmittal letter dated March 22, 1946, plaintiff submitted Requisition #6 covering the period after January 15.1946, to March 15,1946, in the net sum of $136,457.36. By letter dated April 1, 1946, defendant advised plaintiff that as agreed in a conversation on March 29,1946, payment on Requisition #6 would be withheld pending further progress on the contract.
Plaintiff submitted Requisition #7 for an additional $94,219.14, dated April 15, 1946, and Requisition #8 for $62,722.07, dated May 15, 1946.
By letter dated June 7, 1946, defendant advised plaintiff that action on Requisitions #6, #7, and #8 was being deferred pending reconsideration of defendant’s rejection of the diesel engines provided by plaintiff, acceptance of the proposed lighting generator and electrical equipment by the defendant’s inspector and by the consulting engineers for the French Mission, and progress on and clarification of items set forth in those requisitions. By the date of this letter, defendant had already paid about 73% of the contract price, or a total of $1,172,868.71, in the way of progress payments.
Plaintiff submitted Requisition #9', dated August 15, 1946, in the net sum of $65,146.25.
Defendant’s records show that as of September 9, 1946, Requisitions #6, #7 and #8 had not been certified for payment because the luffing mechanism proposed by plaintiff had been disapproved by the requisitioning agency, that the *339 proposed engines, generators and accessories had likewise been disapproved, and that the lighting generators had not been approved because agreement concerning testing had not been reached.
24. In its letter dated June 7, 1946, mentioned in finding 23, defendant contrasted the respective estimates of the parties as to percentages of completion of various sections of the floating cranes, and stated the percentages already certified for payment, as follows:

25. Under Section 3, Main Characteristics of the Cranes, set forth on the continuation sheets of the contract, the parties agreed with respect to the testing of a crane, as follows:
3-07. Tests. The cranes specified in Section 1-01 shall be tested in the following way:
Stability
For this test static test loads are to be used, equal to:
9 metric ton for cranes of 6 metric ton capacity. The static test load shall be carried out at reduced speed, the load shall be picked up from the ground at the maximum reach of the crane, shall be raised to a height of about 3.50 feet and shall be slewed around as far as possible.
The boom shall be brought back to the minimum reach: through inverse slewing followed by luffing and by lowering, the load shall be returned to its point of departure.
The above tests shall be carried out on each of the tested cranes without danger of a break or reversal of the machine and without its being attached to the rails.
These tests are to be carried out without any speed guarantee for any of the motions.
*340 Test of Proper Functioning and Efficiency
A rated load shall be taken from the wharf or a float at the maximum reach of the boom, hoisted to a height of about 50 feet, slewed by 180°, returned to the ground, then brought back to its point of departure, describing exactly reversed trajectory.
The complete series of movements described above shall be repeated twenty times within an hour with a load equal to the normal capacity, and twenty times with a load equal to one-half of the normal capacity, the loads being alternated, and the slewing being performed simultaneously with the hoisting and lowering.
In order to determine the speeds of the various motions, at least 6 measurements shall be taken on crane. The speeds shall be measured in both directions. At the end of the test:
(a) The temperature of the various parts of the electric motors, of the brake coils and the contact relays, of the electric resistances, and, generally speaking, of all parts of the electrical equipment shall, on the one hand, be below the maximum temperature set for each of these parts by the latest rules of the National Electrical Manufacturer’s Association, and, on the other hand, their temperature shall not exceed the surrounding temperature by a larger amount than is allowed by the above mentioned regulations;
(b) No bearing shall have its temperature exceed the surrounding temperature by more than 68° F. with the exception of the motor bearing;
(c) The brakes shall not show any abnormal heating. Moreover, either during the course of the tests described above, or apart from these tests, all necessary investigations required to make sure that the principal equipment and accessories are well established shall be undertaken. In particular, the proper operation of the brakes, of the limiting devices and of the bucket shall be tested as well as the precision of the hoisting operations, the slewing and luffing in a general way.
All the expenses of supplies, labor and any other expenses entailed by these tests shall be at the manufacturer’s charge.
Upon completion of the tests the Contractor shall remedy all defects at his expense, and, if deemed necessary by the Purchaser, shall repeat the part of the test which was previously not satisfactory.
*341 26. Under Section 5, Structural Work, set forth, on the continuation sheets of the contract, the parties agreed in paragraph 5-05 as follows:
5-05. Level Luffing. The dead weight of the boom (dead weight of the bucket included) shall be counterbalanced by a special counterweight or by other means. The boom luffing shall be so arranged that when luffing the boom and with hoisting winch at rest, the load shall move approximately horizontally, the range of deviation from horizontal path not exceeding 8 inches.
The Contractor is free to offer a level luffing arrangement of his choice, provided the proposed arrangement has been in successful operation for at least one year, and provided the center of gravity of the dead weight of the whole revolving structure shall be on a fixed line at all positions of the boom, as near as possible to the center line of rotation.
27. Under Section 6, Mechanical Work, set forth on the continuation sheets of the contract, the parties agreed in paragraph 6-01 as follows:
6-01. Design. Mechanical work shall be of rugged design. All features of mechanical design used shall have been in successful operation for at least one year. Machinery shall be fully capable of operating the cranes in conjunction with the motors or engines at the specified speeds and at the maximum specified loads with ease, safety, and minimum noise and vibration. All parts shall be designed so that they may be easily assembled, adjusted, and repaired and shall be readily accessible for inspection, cleaning and lubrication. All fastenings or parts which are likely to become loosened by vibration shall be securely [sic] by approved devices which will insure safety and reliability of the feature concerned. The following parts shall be designed to withstand the stresses under the rated loadings, without impact, with factors of safety, based on the ultimate strengths of the materials of not less than the following:
Part Min. Factor of Safety
Shafts, axles, sheave pins and hooks. ia
Ropes_ ®
However, for steel having ultimate tensile strengths greater than 75,000 pounds.per square inch, unit stresses *342 in excess of % the ultimate strength may be used subject to prior approval; if used, the mechanisms shall have proper stiffness.
28. Under Section 8, Electrical Work, set forth on the continuation sheets of the contract, the parties agreed in paragraph 8-01 as follows:
8-01. Electrical Equipment. The Contractor shall be responsible for the correct size and characteristics of the generators, motors, brakes and controllers. The generator, motors, controllers, electric brakes and protective panel equipment shall be the product of manufacturers specializing in the regular production of this type of equipment to National Electrical Manufacturers Association standards. The features of all equipment and parts used shall be of a design which has been m successful operation for at least one year. The controllers and protective panel equipment shall be the product of the same manufacturer.
29. Early in December 1946 plaintiff’s president contacted defendant’s Deputy Director in charge of Purchase Branch, Procurement Division, and advised that plaintiff had a crane erected and ready for test, and it was agreed between them that they would meet at New York City to make preparations for the running of the test.
The meeting was held about December 19,1946, and present were defendant’s Deputy Director and other Treasury officials and also plaintiff’s president and its then attorney. Defendant then presented a written Test Agenda which had been prepared at the request of Treasury Procurement Division by the Army Transportation Corps Board. This Test Agenda provided in paragraph one for a general inspection and in paragraph two and three for a stability test and operating test as follows:
2 — STABILITY TEST
(a) A load equal to 9 metric tons shall be suspended by the crane at the maximum reach of the boom, with the boom slewed to maximum athwartship position. With the load suspended in this manner, the angle of heel, with no wind effect, shall not exceed 7.80%, as determined by a pendulum deviation, or by draft readings.
*343 3-OPERATING TEST
(a) With, a load equivalent to 9 metric tons (50% overload) and operating at reduced speeds.
The load to be picked up, at the maximum athwart-ship reach of the booin, to a height of about 5'.0 and slewed around 270° until boom is directly aft.
The boom with load intact shall then be luffed from maximum lowered to maximum raised position. Load shall then be returned to original position by simultaneously slewing and lowering of boom, followed by lowering of load.
During this test all mechanical and electrical brakes and locking devices shall be demonstrated for satisfactory performance. This test shall be repeated 10 times.
(n) With a load equivalent to 7.5 metric tons (25% overload). Load shall be suspended at a height of 5'.0 above ground with boom at lowered position and directly forward on longitudinal centerline of barge.
The boom with load intact shall then be raised at maximum speed, and when close to top of luffing travel,, electrical brakes shall suddenly be applied, to obtain a quick stop. In similar manner this shall be repeated while lowering the boom. This cycle shall again be repeated, this time using the mechanical brakes.
The above complete cycle (raised twice) shall be repeated for Í0 times.
At the conclusion of this test, if required, the luffing cone drive reducer shall be disassembled for inspection.
(c) With a load equivalent to 6 metric tons (rated load). By an average of three readings, compliance with the following specified speed requirements, shall be determined :
a) Notation (Both directions) —at maximum radius— 1.5 E. P. M.
b) Luffing — from maximum to minimum (Both directions) — 18 seconds.
c) Hoisting speed — 240 ft. per min.
The crane shall then be operated to determine satisfactory operation with slewing, luffing and hoisting mechanisms all operating simultaneously.
The hoisting mechanism shall be demonstrated to determine the ability of same to hoist and lower with adjustable speeds. Braking shall also be tested to determine progressive braking.
Part II of the Test Agenda was headed Diesel Engine & Generator Test and provided as follows:
*344 1. SCOPE ON TEST
The test should be carried out on. one of the two diesel generators installed in the floating crane at the Meyer-stein plant in Long Island City, New York. The test shall establish the suitability of the Diesel generator for supplying the rapidly varying electric power demand of the crane installation. The maximum demand of 85 Kw wrill be hereinafter referred to as the fu 11 load. _ The load should be applied in the form of a variable resistance.
2. TEST SET-TJP
(a) For determining the fuel consumption, a container of about 5 gal. capacity should be connected by a 3-way cock to the fuel line running from the fuel tank to the engine. A graduated gage glass attached to the container should permit the reading of the fuel consumption within % of a gal.
A portable pyrometer should be obtained (preferably rented from the General Motors Detroit Diesel Engine Division, 342 Madison Ave., N. Y. C.) for the observation of the exhaust temperature of the engine.
A water barrel rheostat could be used as generator load during the test. An open top steel barrel is preferable with one of the generator loads connected directly to the side of the barrel and the other connected to the adjustable single electrode. A 3-foot long 3- or 4-inch standard pipe adjustably suspended by rope and pulley over the center of the barrel could serve as an electrode. Water in the barrel should be maintained at a constant level with a hose supply line run to the bottom of the barrel and an overflow line provided at the top. Fresh water should be used with salt added in amounts requisite for full load on the generator when three-quarters of electrode is immersed.
3. TEST PROCEDURE
(a) After engine has been warmed up, the following runs should be made:
% hrs. Vi load = 21.3 kw.
1 “ % “ = 42.5 “
2 “ % “ = 63.8 “
4 “ full “ = 85.0 “
V% “ 120% “ =102.0 “
(b) The load should be varied by changing the electrical load of the generator through immersion of electrode. The voltage should be maintained constant by the field rheostat during each run between 235 and *345 240 volts and records of this should be kept. The load, that is the amperage, should be kept as near to constant as possible during each run by adjusting the immersion of the electrode. Record of the range of current fiuctua-ation should also be kept. Near the end of each period, after fuel consumption readings have been taken, the load should be instantaneously removed (by tripping the circuit breaker) and then again suddenly reapplied. The interruption of the load should be made once near the end of the %, y2, % and full load period and three times near the end of the 120% full load period.
(c) The following readings should be taken during the test:
a. exhaust temperature
b. fresh water temperature
c. oil temperature
d. oil pressure
e. engine speed
(d) Readings should be taken and recorded every 10 minutes of the a. on the portable pyrometer and of b., c., d. and e. on the instrument board, e. should be observed continuously and the range of speed should be recorded during each period and also particularly when removing and reapplying the load.
(e) The setting of the field rheostat or the immersion of the electrode should not be changed while the load is removed, but the voltage should be noted during these periods.
(f) After the completion of the 120% full load run the load should be removed and the voltage adjusted to 240 volts. Then the load should be re-applied once more and the volt and ammeter readings noted. At the end of this test, the temperatures of the armature and field windings should be measured with thermometers and recorded.
(g) Appearance of the exhaust should be observed and noted during each period.
(h) Fuel consumption during the steady state run of each load period should be determined and noted.
(i) Upon completion of the above tests, the engine shall be examined. For this purpose, at least one working cylinder shall be opened, piston pulled and the cylinder bore examined as well as wrist pin and crank pin bearings, also main bearings, valve seats, fuel pump plunger and such other parts as are subject to wear. If upon examination of these parts, excessive wear or damage is found, the remainder of the engine shall be dismantled. for examination. All worn parts shall be *346 replaced and the engine subjected to another full load test of eight (8) hours followed by the % hour overload test, specified under test procedure, to further determine suitability of use for which intended.
(j) After the tests are run, the reduction gear shall be opened for a thorough inspection.
(k) If during the above tests, any appreciable vibration develops, a vibrometer test shall be run to determine the amplitude and direction. The amplitude shall not exceed .003".
(l) Barometric pressure and temperature should be recorded and chemical analysis and specific gravity of the fuel oil should be obtained.
Part III of Test Agenda was headed Test of Electrical Equipment and provided as follows:
1. In addition to the instrument readings enumerated in the description of the Diesel Generator Test, the following measurements shall be taken to comply with the General Specifications of this contract.
(a) Insulation resistance of wiring against ground (1200 Megohm per 1000 meter 4 x 106 megohm per foot minimum. Spec’s 8-03). This is to be measured with a Megger ohmmeter. The following lines are to be-tested:
a. Power lines between generator panel and protective panel.
b. Light circuits between lighting panels and light fixtures.
(b) Insulation resistance against ground in each of the two generators and four crane motors. This is also to be measured with the Megger ohmmeter (1 megohm minimum).
(c) Voltage drop in circuits at maximum load. This measurement should be taken with a portable voltmeter during general crane test (spec’s 3-07).
a. In power circuits between generator panel (voltmeter on panel) and individual motor terminals, while all motors are running (5% drop maximum, spec’s 8-03).
b. In lighting circuits between light generator panel (voltmeter on panel) and individual light fixture while all lights are turned on. (3% drop maximum, spec’s 8-03)
(d) Actual load on motors during crane operation. Individual motors should be tested with maximum mechanical load. Voltmeter and Ammeter readings on the generator panel should be taken during short individual runs of Holding Line, Closing Line, Slewing and Luf *347 fing Motors. Nameplate ratings should be noted for comparison.
(e) At the end on the crane operating test, the following temperatures should be measured:
a. Temperature of Motor armatures, field windings and brake coils. — To be taken with thermometer.
b. Temperature of control resistors. — To be taken with pyrometer.
Instruments required:
1. Megger ohmmeter
2. Portable voltmeter (250 V)
3. Thermometer (150° C)
4. Portable pyrometer (500° C)
Part IV of the Test Agenda provided:
At the conclusion of the above tests, if in opinion of the War Department representatives any other tests are deemed necessary to further establish the suitability of any particular piece of equipment for the service intended, these tests shall be conducted.
30. At the meeting on December 19, 1946, the defendant requested that the crane test be conducted in accordance with the requirements of this Test Agenda, but upon review of the provisions thereof, plaintiff’s president stated that the requirements of the Test Agenda went beyond those specified in the contract test, and that plaintiff would submit to the contract test but refused to run the test' in accordance with the Test Agenda.
31. By letter dated December 20,1946, plaintiff wrote defendant as follows:
We have reviewed the Test Agenda in connection with Contract No. DA-TPS-92430, Requisition No. CF-324-325 (partial), as submitted to us at our conference with Mr. Freeman and the representatives of the Army Engineering Corps on Thursday, December 19, 1946 — the day set for the tests.
After this further review of these Test Agenda we feel obliged to reiterate the position we took at the conference on December 19:
(a) The Test Agenda as submitted is completely at variance with the Tests provided in our contract DA-TPS-92430, Requisition No. CF-324-325. These Test Agenda would impose requirements of performance of the cranes very substantially in excess of the requirements called for by the Tests provided in the Contract.
*348 (b) While we feel sure that our crane, engines and electrical equipment can meet the tests provided in the Test Agenda, we do not believe that we are obliged in the slightest degree to accept these entirely different and excessive test standards in place of those agreed upon in the Contract. Accordingly, we will not agree to accept these tests in place of those provided in the Contract.
(c) We continue to be willing, as. we stated at the-conference on December 19, to permit the tests as set forth in the Test Agenda, but only on an informal basis and after completion of the Tests provided in the Contract and the acceptance of the crane, engine and elec-: trical equipment.
We take this opportunity to call your attention to the fact that Thursday, December 19,1946, was the day set for the Tests as provided in the Contract; and that we were ready and willing to submit the crane to those-tests at that time. Every day’s delay in the performance of these tests is causing us substantial expense and damage. Accordingly, we respectfully request that the tests as provided in the Contract be held on Thursday, December 26, 1946.
32. Plaintiff proceeded to have the crane test conducted by the American Bureau of Shipping on December 26,1946, in accordance with the requirements of the contract, and the-American Bureau of Shipping gave the test crane a satisfactory rating.
33. By letter dated December 28, 1946, plaintiff wrote to-defendant in pertinent part as follows:
* * * * *
On December 19,1946, the date set for the test of the subject cranes, you refused to proceed with the contract, tests but sought to impose test requirements substantially in excess of the requirements called for in the contract. We objected, as outlined in our letter of December 20, 1946.
We,, therefore, requested the “American Bureau of Shipping”, who are mentioned in the contract specifications, to run the contract tests. You will agree they are capable and well qualified to do this.
Their findings and Test Certificate are attached and are self-explanatory.
Needless to say, we are gratified and feel complimented by their report which, we believe, amply confirms our policies stated above.
*349 We believe that this certificate properly completes the performance of our contract. We therefore request immediate and complete shipping instructions and releases of all monies withheld.
The findings of the American Bureau of Shipping are not in evidence in this case. The Test Certificate recited that at the request of plaintiff, a surveyor of the Bureau attended the proof testing of a 6-metric-ton derrick barge afloat at plaintiff’s Long Island City plant on December 26,1946, and that the derrick lifted 19,800 pounds, or about 9 metric tons, when the derrick was at an angle of 90 degrees to the longitudinal, and that examination after test showed no signs of physical weakness.
34. The Procurement Division of the Treasury Department had requested the Army Transportation Corps Board to draw up a test agenda that would prove the reliability of the crane and remain within the intent and spirit of the contract specifications.
In the preparation of the Test Agenda, the assigned marine engineer and his assistant reviewed the test provisions of the contract and also other parts of the specifications. They engaged in research and failed to find that the level-luffing mechanism designed by plaintiff had been in successful operation for one year in the United States, although they learned but could find no details concerning longer operation of such equipment in Europe. Furthermore, they had information from the manufacturer of the Gray Marine Diesel engine provided by plaintiff that this engine was a “souped-up” version of the regular model, and that it had a rating of 225 horsepower for short-time duty, but that the regular rating was 160 horsepower for intermittent and 90 horsepower for continuous service. They knew that the crane generator, operated by this engine, was required to produce 85 kilowatts, and they were concerned whether the generator requirements would exceed the rated capacity of the diesel engine provided by plaintiff. The authors of the Test Agenda also studied plaintiff’s use of reduction gear to connect the engine, and generator, and while they recognized that there was nothing improper about the use of such a system, they were concerned whether such a “unique set-up” would show any signs of unusual wear.
*350 35. The authors of the Test Agenda considered and relied upon certain correspondence received by the engineers for the French Mission, which were critical of the diesel engines and generators provided by plaintiff.
Gray Marine Motor Company by letter dated January 25, 1946, advised the engineers for the French Mission that this particular diesel engine was one of a series manufactured by them for operation by the United States Navy in amphibious craft, that engineering data concerning the engines was restricted by the Navy, and that the manufacturer was not permitted to send out blueprints on them. This letter, concluded with the assertion that the engine would not operate well at low speeds due to its particular design and that no advice could be given on using it as a generator drive since it had been furnished as a propulsion unit.
Another letter dated January 18,1946, purportedly written by a consulting naval architect, asserted that the proposed engine was not suitable for driving the generator and also to serve for propulsion of the barge.
Two other letters considered by the authors of the Test Agenda were an exchange of correspondence in early October 1946 between the engineers for the French Mission and the manufacturer of the engine, in which the manufacturer confirmed its previous telephonic advice that the engine “which is going to be used to drive a generator at 1800 EPM engine speed must have a constant speed governor in the place of its present limiting speed type governor,” and that the “present 90 Cu. mm. fuel injectors should be replaced, maximum engine load permitting, by 60 cu. mm. for better fuel economy and speed regulation.” The manufacturer further stated that it did not desire to recommend the operation of the engine at 1800 EPM in continuous service without further details as to the nature of the application.
Neither a representative of the manufacturer of the engine, nor any of the consulting engineers for the French, nor the naval architect who wrote the letter dated January 18,1946, was called to testify in the trial of this case.
In early June 1946, the defendant’s Deputy Director in charge of the Purchase Branch, Procurement Division, had rejected the diesel engines provided by plaintiff, and again *351 rejected them in July 1946. Eventually these engines were accepted by the defendant without any changes having been made.
36. The level-luffing mechanism designed and provided by plaintiff was a principal piece of equipment of the crane. The authors of the Test Agenda and the defendant’s inspection engineer were unable to establish that this level-luffing mechanism had been in successful use in the United States for a year prior to the time the Test Agenda was drawn. They entertained doubt as to the ability of the luffing mechanism as designed by plaintiff to function properly and to continue to function on repeated operations. The repeated tests in the Test Agenda for the luffing and swinging of the crane boom were intended to determine the stability and durability of the plaintiff’s design of the luffing mechanism and the engine-linkage-generator system of the crane.
37. By letter dated January 8, 1947, defendant’s Deputy Director in charge of Purchase Branch, Procurement Division, replied to plaintiff’s written refusal to accept the Test Agenda, and requested that plaintiff state exactly what features of defendant’s proposed test were considered by plaintiff to be beyond the contract specifications.
By letter dated January 16, 1947, plaintiff advised defendant that it considered that all those features and standards of the Test Agenda which are not specifically listed in the contract, or which vary from the contract provisions, were beyond the contract and should not be required by the defendant.
38. By letter dated February 17, 1947, plaintiff wrote to defendant, asserting that the crane sections and parts occupied so much space that they interfered with the operation of the plants of plaintiff and its subcontractors and hindered them from accepting and carrying out profitable work. Plaintiff notified defendant that :
* * * starting March 1, 1947, unless you have made other arrangements for storing the completed articles or you have accepted and issued Shipping Instructions for these articles, we will have to charge your account for the full and continued use of our plant, for storage purposes, at the same rate as if it were gainfully em *352 ployed in fabricating. We make this offer without prejudice to any charges that will have accumulated to March 1st, due to your inability to accept the completed articles.
39. By letter dated February 19,1947, defendant’s Deputy Director, Purchase Branch, notified plaintiff that his office was of the opinion that the test proposed by the Transportation Corps Avas within the scope of the contract, and requested that plaintiff advise as to when it would be ready to submit the crane for this proposed test.
The author of this letter was not the defendant’s contracting officer. By letter dated March 17,1947, the plaintiff treated him as such and appealed his decision to the Secretary of the Treasury. By letter dated April 21, 1947, the Acting Secretary of the Treasury advised plaintiff that plaintiff’s appeal was not properly before him because the author of the letter of February 19, 1947, was not the contracting officer, and further because Article 12 of the contract, being limited to questions of fact, did not cover the question of interpretation as to whether the proposed test was within the scope of the contract. The Acting Secretary further stated that the Bureau of Federal Supply, Treasury Department, which was the successor agency of the Procurement Division, had not given up hope that it could settle its disagreements with plaintiff, suggested that plaintiff renew its negotiations with the Bureau, and advised that if such efforts failed, the Bureau would provide plaintiff with a properly appealable decision of the contracting officer Avith respect to questions of fact, such as the questions whether the level-luffing arrangement and the generating power plant had been in successful operation for at least one year.
40. By letter dated June 5, 1947, defendant’s Deputy Director, Purchase Branch, referred to his letter dated February 19, 1947, stated that no reply had been received, and again requested advice as to when plaintiff would submit the crane for the test proposed by the Transportation Corps.
By letter dated June 10,1947, plaintiff advised defendant’s Deputy Director that as stated in its previous letters of December 20 and 28,1946, and March 17,1947, the Test Agenda *353 of the Army was not within the scope of the contract and not otherwise justified by any circumstances involved, asserted that plaintiff had completed performance under the contract and had advised defendant some time ago that it only awaited shipping instructions to deliver the material, invited attention to the letter of the Acting Secretary of the Treasury dated April 21, 1947, and asserted that plaintiff had not been advised of any decision of the contracting officer.
41. By letter dated July 15, 1947, the defendant’s contracting officer, the Special Assistant to the Director, Bureau of Federal Supply, advised the plaintiff as follows:
The undersigned contracting officer under the above-numbered contract, after having carefully considered all information, opinions and contentions advanced by you to this Bureau on the subject, hereby finds, insofar as such finding is upon questions of fact within the meaning of Article 12, entitled “Disputes”, of Procurement Division Contract Terms No. 6, which terms are incorporated into and form a part of said contract, that the tests described by the Transportation Corps Board, New York Port of Embarkation, in its Test Agenda to be conducted on a Prototype Barge Mounted Crane constructed in accordance with said contract (a copy of which Test Agenda has previously been furnished to you) are entirely within the scope of said contract.
Demand is therefore again made that said crane be tested according to said tests, without further delay.
This office will be glad to cooperate with you in arranging for the exact time and place for such tests within the immediate future.
42. On August 14, 1947, the defendant conducted tests of the crane in accordance with the test procedures specifically named in the contract, as well as those in the Test Agenda. This test was conducted by defendant’s Chief, Lend-Lease Inspection Division, Bureau of Federal Supply, and after the tests provided in the contract were completed, he stated that the cranes were accepted.
43. By letter dated August 26,1947, plaintiff requested defendant to furnish shipping instructions. By letter dated September 5, 1947, defendant’s chief inspector of the New
*354 York office, Bureau of Federal Supply, advised plaintiff in pertinent part as follows:
Before application for Skipping Instructions can be acted on by our Transportation Section _ it will be necessary to obtain availabilities and coordinate movements of materials inspected and accepted. _
_ Much of the detail in connection with shipping, however, is contingent upon receipt of packing lists and reconditioning of material, both of which subjects have been covered in separate correspondence with yourselves.
Our Central Office has formally advised this office regarding results of the tests and the information received conforms to that set forth in paragraph two of your letter of August 26th.
44. By letter dated October 8, 1947, plaintiff advised the New York Office, Bureau of Federal Supply, that it had not as yet had an official acknowledgment of acceptance of the crane by the Treasury Department, stated that it was anxious to take down the crane, and would commence this work about October 15 in the absence of further word from the defendant.
By letter dated October 10,1947, defendant’s chief inspector of the New York office advised plaintiff that it could consider his letter dated September 5,1947, quoted in finding 43, as confirmation that the test met the specifications of the contract, and stated that it would be satisfactory for plaintiff to proceed to dismantle the test crane and prepare it for shipment.
45. Commencing after the test on August 14,1947, plaintiff began to prepare the crane parts and sections for shipment. Defendant provided plaintiff with shipping instructions in October 1947, and shipments to France began at that time and lasted through the next six or seven months, with the final shipment being made June 28, 1948.
46. Commencing with October 20, 1945, plaintiff accumulated various crane parts, sections, equipment, machinery and material concerned with the contract between the parties, which plaintiff could have promptly shipped had defendant accepted delivery and provided shipping instructions. The following schedule is a summary of the progressive accumulations of such materials in storage, inside and outside of *355 plaintiff’s buildings at its plant properties in Long Island City, New York, and Ampere, New Jersey:

The accumulated total of 1,677.5 tons of inside storage as of August 15, 1946, and of 542 tons of outside storage as of June 15,1946, remained on plaintiff’s property until October 1947 when shipments of materials commenced. The times and extent to which such tonnages were reduced by shipments during the period from October 1947 until June 1948, when all shipments had been made, are not established by the evidence in this case.
47. In addition to the costs of storing materials at the plants and yards of plaintiff in Long Island City and in Ampere, New Jersey, plaintiff claims storage charges in behalf of one of its subcontractors, Consolidated Shipbuilding Corporation, for storage of materials at this subcontractor’s yard located at Morris Heights, Bronx, New York, N. Y.
Plaintiff subcontracted to Consolidated the fabrication of the A-frames, hoist drums and machinery houses for all 12 floating cranes and also the barge plates for 6 of them.
*356 Six of the A-frames and six of the machinery houses were ready for shipment by April 15, 1946, and the remaining 6 A-frames and 6 machinery houses were ready by June 15, 1946. The barge plates were ready by the latter part of January 1946. The hoist drums were sent to plaintiff’s plant upon completion, but all of the remaining materials of this subcontract had to be retained and stored at Consolidated’s yard in outside storage, except that one set of barge plates, together with one machinery house and one A-frame were delivered to plaintiff by June 1, 1946. The Consolidated storage claim is for five sets of barge plates which weighed a total of 611 tons, for 11 sets of A-frames which weighed a total of 90 tons, and for 11 sets of machinery houses which weighed a total of 44 tons.
Waiving the storage charges from the end of January 1946, when the barge plates were completed, through the month of February 1946, on the grounds that a customer is entitled to that amount of time in which to take delivery, Consolidated claims storage charges at the rate of $2.00 per ton per month for the 27 months from March 1, 1946, through May 1948, for the storage of the 611 tons of barge plates, or a total sum of $32,994.
Waiving the storage charges from the dates of completion of the A-frames and machinery houses in April and June 1946 to August 1, 1946, Consolidated claims storage charges at the rate of $2.00 per ton per month for the 90 tons of A-frames and for the 44 tons of machinery houses for the 22-month period from August 1, 1946, through May 1948, or the sum of $3,960 for the A-frames and the sum of $1,936 for the machinery houses.
48. Under date of May 24, 1948, the defendant’s Bureau of Federal Supply, Treasury Department, entered into a contract, designated DA-TS-59, with Consolidated Shipbuilding Corporation, in which for a consideration, based upon labor rates per man-hour, Consolidated agreed to furnish the necessary equipment, facilities, labor and material to wire-brush, re-paint, re-weld, re-strap, re-mark where required, barge plates, A-frame sections and machinery house sections (purchased under Contract DA-Tps-92430) located at Morris Heights, Bronx, New York, N. Y.
*357 Under this contract, Consolidated during June 1948 reconditioned the floating crane parts and sections stored on its property. The Treasury Department made direct payment of the consideration to Consolidated, and accepted delivery. Shipment was made of all such materials on June 25, 1948. Consolidated claims nothing for storage of the materials for the month of June 1948.
49. From all of the testimony and evidence in this case pertaining to the issue as to what were the reasonable prevailing charges in the New York City area during the periods of time pertinent to this case for the inside and outside storage of the materials, parts, sections, machinery and equipment of the floating cranes, it is concluded that the fair and reasonable charges were $1.50 per ton per month for outside storage and $2.00 per ton per month for inside storage.
50. At the insistence of the defendant, plaintiff reconditioned and refinished much of the material it had in outside storage at its Long Island City plant. Long exposure had resulted in peeling of the paint and appearance of rusting. The work consisted of wire-brushing, cleaning and repainting.
51. During the period from August 21,1946, to December 30, 1947, plaintiff paid insurance premiums on the floating crane materials in storage in the gross amount of $7,017.05, which sum plaintiff has conceded should be reduced by credit to defendant in the sum of $2,143.37, and the net amount expended by plaintiff is the sum of $4,873.68.
52. Plaintiff’s president testified that during the storage of the floating crane parts and sections, its lease on its plant and yard expired, and its landlord brought dispossess proceedings. He further testified that plaintiff was “put to expense to defend the action and get extensions” of the lease, and that various extensions were allowed. There is no evidence as to when the lease expired, or when the dispossess proceedings were commenced, or as to the nature of or reasonableness of the “legal expenses” incurred in the alleged sum of $10,000.
53. Plaintiff had various items of material fabricated by a subcontractor at a plant in Phoenixville, Pennsylvania, *358 and upon acceptance of such, items, defendant arranged and paid for their shipment by rail to New York for export. Since plaintiff was obligated to make delivery at its Long Island City plant, defendant charged and withheld from plaintiff freight expenses in the sum of $2,099.27, whereas the actual freight charges as represented by the bills of lading should have been $1,299.60, with the overcharge by defendant against plaintiff being $799.67.
54. From February 10,1948, to March 3, 1948, plaintiff at the request of the Federal Bureau of Supply provided a crew of men to load the crane parts and sections on lighters to be furnished by defendent. Defendent was delayed in providing lighters, and plaintiff was required to pay for standby labor in the sum of $2,531.08.
55. Plaintiff claims “in” and “out” charges in connection with the storage of the crane parts and sections, but the evidence in this case fails to show the added extent to which plaintiff was required to handle the crane materials because of defendant’s failure to accept delivery in the manner contended for by plaintiff, or the extent, if any, to which plaintiff had increased costs in the handling of such materials.
56. By letter dated October 20, 1947, plaintiff submitted its claim to defendant’s Bureau of Federal Supply, Treasury Department, for charges for storage and handling of the floating cranes in the sum of $176,006.84, and stated in pertinent part as follows:
The total billing in the amount of $176,006.84 represents the two invoices of Consolidated Shipbuilding Co. in the total amount of $27,270.00 for the period ending September 1947, and our invoice in the amount of $147,736.84 covering the period of August 20, 1946 (the date contract materials were completed) to August 20, 1947. Additional billing will be rendered on the date contract materials will be removed from our premises, representing period from August 20, 1947 to the actual shipping date.
In reply to this letter, defendant’s Chief, Contract Division, Bureau of Federal Supply, by letter dated October 27, 1947, requested plaintiff to furnish copies of various letters of plaintiff mentioned in the claim letter. These letters were supplied by plaintiff on November 20,1947.
*359 The record in this case suggests that thereafter conferences were held between plaintiff and representatives of the Bureau of Federal Supply concerning plaintiff’s claim.
57. By Settlement Certificate, dated July 18, 1949, the Comptroller General of the United States advised plaintiff that its claim for $178,424.25, alleged to be due as excess costs incurred by reason of delay in acceptance of barge-mounted cranes furnished the Treasury Department under contract No. DA-Tps-92430, had been carefully examined and that no part thereof could be allowed. This Settlement Certificate stated the reasons for disallowance, as follows:
The period of delay appears to have been the result of controversy between you and the Government as to the right of the Government to require certain tests before acceptance of the cranes. It was your position that the tests proposed were beyond the scope of the contract specifications.
Although the tests finally made were as called for under the terms of the contract, it has not been established that the Government’s side of the controversy was wrong, and there is no reason to consider that the Government is liable for excess costs resulting from delay due. to such controversy. Accordingly, there appears no basis on which this office may allow payment to you of any part of the amount claimed.
58. By letter dated August 3, 1949, plaintiff appealed to the Secretary of the Treasury from the decision of the Comptroller General.
By letter dated September 22, 1949, plaintiff’s present attorneys wrote to defendant’s Director, Bureau of Federal Supply, General Services Administration, as follows:
Re: Contract No. DA-Tps-92430 Anthony M. Meyerstein, Inc.
Dear Sir:
.We would appreciate it very much if you would be so kind as to let us know what, if any, action has been taken by you regarding the above matter, and, if nothing has been done, when we may expect to receive your determination.
This matter has dragged in the Contracting Officer’s Division for an unreasonably long period of time, and we feel that it ought to come to a dose.
*360 We implore you to be so kind as to make an immediate determination.
59. By letter dated September 27,1949, defendant’s Assistant Chief Counsel, Bureau of Federal Supply, General Services Administration, wrote to plaintiff, and advised with respect to plaintiff’s appeal letter of August 3, 1949, addressed to the Secretary of the Treasury, that there was no authority for the Secretary of the Treasury, or the Administrator, General Services Administration, to entertain or take action upon an appeal from settlement of a claim by the Comptroller General. Regarding recent correspondence addressed to the Director, Bureau of Federal Supply, from plaintiff’s present attorneys, this letter requested advice as to whether the Bureau should communicate with them or the law firm which had previously represented plaintiff.
60. By letter dated October 11,1949, plaintiff’s present attorneys replied to the Assistant Counsel, Bureau of Federal Supply, asserted that the rejection of the plaintiff’s claim by the General Accounting Office was really the action of the contracting officer through the Comptroller General, and requested advice as to whether the Director, Bureau of Federal Supply, was the designee of the Secretary of the Treasury to hear the appeal.
By letter dated October 25, 1949, defendant’s Assistant Chief Counsel, Bureau of Federal Supply, advised plaintiff’s present attorneys that plaintiff had requested the Bureau to communicate with them concerning Contract No. DA-Tps-92430, and restated his opinion that neither the Secretary of the Treasury nor the Administrator, General Services Administration, could entertain an appeal from the settlement of the claim by the Comptroller General, rejected plaintiff’s contention that disallowance by the Comptroller General was really the action of the contracting officer, and advised further, as follows:
As this Bureau advised your client in its letter of September 27,1949, there is nothing to prevent your addressing an appeal directly to the Comptroller General from this settlement, if you so desire. You must, of course, be the judge of the desirability of such appeal, and this Bureau has no suggestion or comment to offer on that point.
*361 Referring further to your letter of August 22, 1949, addressed to Mr. Clifton E. Mack, Director, Bureau of Federal Supply, and particularly to the fourth paragraph, evidently you have been misinformed or have misunderstood the situation when you state “our client says it was led to believe by representatives of the Treasury Department that they were prepared to pay the sum of $178,424.25 in settlement of the claim if the Contractor would refile the claim in such amount, which the Contractor did.” The contractor was repeatedly and consistently informed by representatives of this Bureau that its revised claim would be submitted to the Comptroller General for decision, and that the decision would rest entirely with the Comptroller General.
In reference to the eighth paragraph of your letter of August 22, 1949, addressed to Mr. Clifton E. Mack, Director, Bureau of Federal Supply, while it is true that representatives of the Government have examined, with your client’s consent, certain shipping and fiscal records, particularly with reference to your client’s claims for “stand-by,” insurance and reconditioning charges, it is not true that the Government has conducted such an extensive and comprehensive examination of your client’s books as this paragraph might be construed to mean, and therefore the Government has not “obtained all the information which the contractor can give,” in the broad sense of the phrase. Your client did break down, analyze, and itemize the various elements of its claim and those figures were submitted to the Comptroller General with its claim.
The record in this case discloses no further communications between the parties nor administrative action on plaintiff’s claim.
61. The net balance of the contract price due and owing plaintiff, aside from plaintiff’s other claims, is the sum of $2,590.96.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover. It is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of five thousand nine hundred twenty-one dollars and seventy-one cents ($5,921.71).